On behalf of the Adelante, Ms. Yasmin Ekin. On behalf of the Adelaide, Ms. Victoria E. Yosef. Counsel, go ahead. I'm sorry. Good morning, your honors. May it please the court. My name is Yasmin Ekin and I represent the appellant William Jiles. In our brief, we raise four issues, including a probable cause issue and two trial error issues. Our central argument, however, is that the state's evidence failed to prove beyond a reasonable doubt that Mr. Jiles was the person who committed the offense in this case. So I would like to address that issue first, and then I also hope to address the issue about the prosecutor's misrepresentation of the facts. Because in light of the weakness of the state's evidence, that error may have been a material factor leading to his conviction. That being said, I would like to take this. Counsel, let me interrupt you. Could you just push that? Sure. Thanks. I'm getting double vision here looking at you. I'm sorry. Thank you. That being said, I would like to bring this court's attention to the fact that I learned this morning that the 2005 decision of Peeble v. Hopkins, a case that I cited in my probable cause argument, was actually recently reversed by the Illinois Supreme Court. It was a reverse pursuit to the state's request for cross-relief from the defendant's appeal of the appellant court's finding that the defendant's statement was sufficiently attenuated from the illegal arrest. And for the first time on appeal in the Illinois Supreme Court, the state had argued that back in 2005, the appellant court erroneously held that the police lacked probable cause to arrest the defendant. Now, the new Hopkins case doesn't change our argument or our position because there were more facts in Hopkins supporting the probable cause finding. But after the argument, I do intend to file a motion for me to cite additional authority with that decision. As to the reasonable doubt issue, Mr. Childs was charged with the residential burglary of Lois Harlan's home. Ms. Harlan testified that sometime between 9-20 and 9-25, she believed that someone entered her home at 1727 West Church Street, threw her back patio, opened her patio door, reached in, entered her home, and moved a bag that she knew she had on the dining room chair to the dining room table. The primary evidence that the state presented in an attempt to link Mr. Childs to this offense was first his presence in the area at a time, near in time, that the offense was committed. And actually, it's his presence in the neighborhood. A dew track that went from 10 to 15 feet outside of the patio area in the yard behind Ms. Harlan's home. And ended up 400 feet from where Mr. Childs was seen walking by Officer Wickman. And inconsistencies in Mr. Childs' explanation for being in the area. But none of this circumstantial evidence connected Mr. Childs to the crime of burglarizing Ms. Harlan's home. First, as to his presence in the area, Doris Gerloff testified that she was a friend of Mr. Childs and she was visiting him. And he asked her to take him to the area because he was going to a party that night. Let me just interrupt for a second. When you said that Doris asked him to take her to the area, I thought that's one of the points that the state relies on. Is that where Doris says she was asked to take him and where he says he was asked her to take him, they're inconsistent. She doesn't support his version of it and it actually puts him much closer to the address at issue. It puts him closer to the address, but it doesn't put him at the scene of the offense. It doesn't put him on that patio. But does it put him lying to the police about where he really was? He says I was never at that house and I was never 100 feet from that house, if I remember exactly. Because I had Doris drop me off way over there and Doris says no, I dropped him off 100 feet from the house. I'm not giving the right numbers here, but you get my point. He says that he was, you're right, but he said he was dropped off at a sign on Pearl City Road. She says she drops him off at the corner of Church and Sullivan, which is actually down the street from Mr. Childs. The address is on Church, right? The address at issue is on Church Street, right? It is. That's right. The point is that the evidence is circumstantial that he lied to the police about whether he was anywhere near that house. You're right, Your Honor. There is an inconsistency where he said he was dropped off and where she said she dropped him off. Well, the significance is the inconsistency places him much closer to the address in question. It places him closer to the address, but again, it doesn't place him at the scene of where the crime occurred. Does it not allow the trier of fact to make a reasonable inference that there was a reason why he was lying as to where he was? There was other evidence that also presented a reason as to why he may be lying as to where he was because he, at the time, had had a romantic relationship with Doris Gerloff and he had also had one with Paula Alafande. He indicated that he told the police that he intended to meet up with Paula Alafande at the Parkview Nursing Home where her daughter used to work while he was dating Paula Alafande. He knew that a month earlier. And then there's the complicating factor of his wife. That's right. So, you know, he could have been, he could have, the reasons he gave for being there to Doris Gerloff, which was to attend a party, could have been because he didn't want her to know that he was meeting up with Paula Alafande. So there is a reasonable inference, I mean, his explanation for being in the area is actually somewhat corroborated by these other facts. And, again, while these facts show his presence in the area, even closer to her home, if you, in the light most favorable to the state, believe Doris Gerloff's testimony of where she dropped him off, they don't connect him right to the scene of the crime. And there are other facts about his presence actually in the area that contradict a reasonable inference that he was connected to the crime because there was a ten-minute delay between the time that the offense occurred and the time that they see William Giles walking down Pearl City Road two streets south of Lois Harlan's home. In that period of time, the actual perpetrator could have been long gone. He was much further away. Mr. Giles was in the area around 9 o'clock. This is not the middle of the night, and there was traffic in the area. He was wearing an aqua blue T-shirt and gray sweatpants, not dark clothing, and he was walking and not running, and he was cooperative with Officer Wickman when Officer Wickman did talk to him. So his behavior was not characteristic of a burglar who had just committed a crime and was trying to escape detection. Another piece of evidence presented by the state in their attempt to connect Mr. Giles to the offense was the dew track. And that dew track started 10 to 15 feet outside the patio area in the back, but there were no footprints on the sidewalk or on the patio itself, no footprints near the patio door. And so that dew track was not connected to the crime itself. You could enter the patio from either the front or the back, but Officer McKee said he never checked the front for footprint tracks. He just went with the back because that track conveniently led out to Mr. Giles. But there were no footprints in the track, so we don't know who made that track. Officer McKee described it as like dragging your feet across the grass. And, again, dragging is not consistent with someone running from the scene and trying to get away once they hear, as they did, Lois Harlan's dog barking and realizing that someone may come to the door. The state also tried to suggest that evidence that Mr. Giles had a wet knee and grass clippings on his sweatpants was somehow connected to this grass or dew track, but there's no evidence that the perpetrator fell in the grass and there's no evidence that they didn't present evidence that her lawn was recently mowed or that somehow these grass clippings would be connected specifically to Lois Harlan's home. So the dew track, first of all, the dew track was never proven to even be connected to the offense, the scene where the crime was committed, and it certainly was not connected to Mr. Giles. And, finally, as has been discussed, the state relied on inconsistencies in Mr. Giles' explanation for being there as evidence of consciousness of guilt, but the contradictory evidence didn't significantly enhance the state's case. As Your Honor noted, it did place, Doris Gerloff's testimony did place Mr. Giles closer to the home, but not near the patio. He told the police that he was going to, he intended to meet Paula Alefandi because he knew she picked her daughter up from work. Paula Alefandi did testify that, indeed, her daughter did work at the Parkview Nursing Home and that she did pick her up from work, but at an earlier time, not at 9 o'clock. That was the inconsistency. Yet they hadn't seen each other for over a month, so it could be that Mr. Giles didn't remember the exact time and he was just hoping to meet up with her there. But regardless, whatever weight the conflicts in the explanation may have had for showing consciousness of guilt, those inconsistencies did not provide a reasonable inference connecting Mr. Giles to the crime of burglarizing Lois Hartland's home. And then, in addition to all those weaknesses in the evidence that the State did present, there was a lack of any physical evidence connecting Mr. Giles to the scene. Officer Heath testified that the bag on the chair was four feet north of the patio door and you would have to step one foot in to get that bag. And Trooper Heindel, the crime technician, took footprint impressions and he fully expected to find footprint impressions in the home because the grass was so wet and he found none. Giles' clothing and shoes were tested for the transfer of any type of dog hairs from Lois Hartland's dog. She said she let the dog out on the patio. That's where she let the dog out. There was no dog hairs found on any of his clothing or his shoes. So the overall weakness of the evidence was highlighted by the fact that two judges prior to trial considered virtually the exact same evidence and found that it did not prove Mr. Giles' guilt beyond a reasonable doubt. Counsel, I don't want you to lose track of time to touch on the motion to suppress and avoid air questions. So I'll keep that in mind, please. Okay. So based on the weakness of the state's evidence and the lack of any physical evidence connecting Mr. Giles to the offense, we would ask, the state failed to meet its burden proving Mr. Giles' guilt beyond a reasonable doubt and we would ask that this court reverse this conviction outright. If this court would like me to, if Your Honor would like me to move on to the voir dire questioning. Yes, sure. Your Honor, a Supreme Court Rule 431B was violated when the trial judge failed to question the jurors on two of his air principles. And those were whether they understood and accepted the principles that the state had the burden to prove Mr. Giles' guilt beyond a reasonable doubt and that Mr. Giles did not have to present any evidence at trial. Now we're arguing error occurred and we're arguing that the first prong of the plain error rule applies here because the evidence was so close that this error, the error alone severely threatened to tip the scales of justice against Mr. Giles. In that regard, the cases cited by the state don't really apply here because either the error was found to not be, the evidence was overwhelming and so the error did not fit under prong one of the plain error doctrine or those courts ruled that the second prong of the plain error doctrine didn't apply because the error was not so serious that it affected the fairness of trial. And here the conflict among the courts as to that second prong of plain error, that doesn't apply here and in fact that issue is currently pending in the Illinois Supreme Court and will be resolved apparently there. So we're saying because of the closeness of the case, Mr. Giles was prejudiced by this error because without being assured that the jurors understood and accepted that it was the state's burden to prove Mr. Giles' guilt beyond a reasonable doubt and that he was not required to present any evidence, they could have subjected the state's very weak case against him to a less strenuous burden of proof. And because Giles didn't present any evidence in his defense, a juror may have held it against him for not doing so. And in fact, that improper bias that Rule 431B is intended to prevent revealed itself through Juror Campbell. In response to counsel's question about whether he believed that someone who had been arrested was guilty, he said someone who had been arrested probably had done something. And then he told the state if a defendant were arrested, he believed that there was probable cause to arrest him and that he would have to try hard to consider the other evidence presented at trial. And even after the judge explained to the juror Campbell that he was required to find Giles guilty beyond a reasonable doubt and he said it's a higher standard than probable cause, Campbell said it would still be, in quotes, hard for him to apply that standard because he knew there was probable cause to arrest. And when the judge reiterated that probable cause was different than reasonable doubt and asked Mr. Campbell if he would be able to apply the instructions of the law, he gave a resounding, yeah, I think so. Then the judge basically concluded by asking him would he be able to follow the law that's given to him. But in fact, the purpose, the committee comments to Rule 431B specifically indicate that the purpose of the amendment was to end the practice where the judge makes a broad statement of applicable law followed by a general question concerning the juror's willingness to follow the law. Is it your position that 431 mandates automatic reversal or that the reviewing court has to look at whether or not the defendant was prejudiced? I think that my position is in this case, under these circumstances, we're under prong one. Mr. Giles was prejudiced and the evidence was close. So, yes, you could look at both prongs. Of course, the cases, there is a conflict in the cases as to prong two. Our position is that you don't even have to reach prong two in this case. But the cases, I would say that this case, both prongs apply. The error here was also so serious that regardless of the evidence. I mean, the evidence was so closely balanced. Yeah, yeah. So, in this. Let me just, you're bell rang, so let me move you over here. When was this guy, when did he move from a Terry stock to being arrested? When he was handcuffed and put in the police car. When he was handcuffed and put in the police car, that turns into an arrest, and why is that? I mean, because he was handcuffed and put in a squad car, do you think that's going to be an arrest? And there was no compelling reason to do so. In the cases. Well, actually, they need a compelling reason to do so, even if you want to call it an arrest. I mean, you know, I'm not following that. I mean, they have to have a reason to even Terry stop him. But the distinction is, I think it's a very fluid concept here, but both of you went back and forth as to where you really think he was arrested. And I guess I'm asking, your position is because he was handcuffed and placed in a squad car, that's always an arrest? Or what's the position? No, my position is not that that's always an arrest. Under the cases that I cited, my position is absent circumstances that this is a crime involving weapons, that perhaps he's armed and dangerous, that they have to. But those kind of factors, the difference between what justifies a Terry stop and an arrest is reasonable suspicion versus probable cause. The level of violence involved in the crime being investigated should not dictate that whether you can arrest him or just Terry sees him. So his potential for being dangerous would seem to be irrelevant to the police authority to move from a Terry stop to an arrest. I apologize, your honor, I must have misunderstood your question. I'm saying that at the time he was formally under arrest, at the time he was handcuffed and put in the squad car, and at that time they did not have probable cause to arrest him. All right, now what if they have him handcuffed and put in the squad car, and within five minutes they get a radio broadcast that they just found a guy hiding in this woman's basement, holding those proceeds from the bourbon. And they say to him, Giles, this is your lucky day, I'm going to keep an eye on you, goodbye. Was he arrested? If they have him in the car and handcuffed, and they don't have, yeah, he was arrested without probable cause. All right, but if he's Terry stopped, they can do the same thing. I mean, the difference is they're allowed in a Terry stop to use whatever force is necessary to restrain him. They can handcuff him, that doesn't make it an arrest. For a Terry stop, they can handcuff somebody, they can put him in a squad car, they can surround him by ten guys. Those are, in order to, a Terry stop is a seizure, and in order to effect a seizure they can use force. So that's not what changes it, and I'm trying to figure out, and Giles, they do this for a couple of minutes while they conduct a further investigation, but it seems to me it's still a Terry stop. Your Honor, from the cases that I cited in my brief, and I'm just trying to take a look quickly here. My understanding isn't that they can handcuff and put you in a squad car for a Terry stop. That wouldn't be my understanding of the cases that I cited. My understanding would be that there has to be, in addition to those typical indicia of arrest, to have those, you have to have other circumstances. For instance, that it's a violent crime, that there's just been a shooting, or that you're going to take the person for a show of identification. Okay, well, you and I have a disagreement on that. Okay. Because, again, I don't think the level of violence involved has anything to do with it. They may have something to do with whether they can handcuff him or not, but it doesn't make... Because the crime is violent doesn't mean they can arrest him faster and with less information than he did, because it's violent. That doesn't give the police authority to move more quickly for arresting him. It does give them authority to handcuff him short of arresting him in the form of a Terry stop, but you and I disagree as to whether you... No, I think that's the point I'm getting at. And, for instance, I have in People v. Nitz, this is exactly what was said by this court, the fact that an individual is in handcuffs doesn't necessarily transform an investigatory stop into an arrest, but when arrest-like measures such as handcuffing are employed, they must be reasonable in light of the circumstances that prompted the stop or that developed during its course. And generally, then, those other cases that I cited, the reasonableness is determined by whether or not there was a recent shooting. In the case of People v. Waddell, it's because the officers had a reasonable concern for their safety because of the risks inherent in intercepting drug traffic. But there's another factor, apart from just the handcuffing, that justifies doing so in a Terry stop situation. Okay. Okay. All right. Anything else you want to say? Right now, I mean, you're going to have rebuttal time, so your time is limited. That's fine. You're on. Thank you very much for your argument. Thank you. Counsel for the People, please. Good afternoon, Your Honors. Victoria Joseph for the People. Counsel? May it please the Court. Hey, this is all my mind's on it. Could you tell me when he was arrested? I can tell you when he was seized. I know when he was seized. Okay. Okay.  Okay. Okay. Fingerprinting and such as that. So I would say when the normal arrest procedures began, probably when he got to the station, that was when there was a definite arrest. He was seized at the point where he was no longer free to leave when the officer stopped him from movement, handcuffed him, and placed him in the vehicle. Okay. Why don't you switch over to the avoidance stuff and let us know about your view on that. Did we not hold in Blair recently in September that irrespective of the closest of the evidence, if you don't give the proper admonishments, it's an automatic reversal? I mean, we recently, she said we don't have to go that far because the evidence is close to her view in this case. But even without her position, that's the holding of Blair. Why isn't this just a flat-out reversal automatically or pretty quickly? In Blair, the majority of this court found that Glasper was distinguishable because in Glasper there was only one zero principle that was missing with a specific question that was being asked. And the majority of this court found the failure to comply, strictly comply, with Rule 431B to have compromised the defendant's right to a fair and impartial jury. The dissent of this court, however, found that Glasper's application was a logical approach to follow and we must look at whether the defendant was prejudiced. The people filed a motion to add authority in this case and addressed a third district case, Russell, that was recently delivered in November of 2009. And the logic and reasoning of Glasper, the people believe, was addressed clearly there where the pre-amendment, the 1997 amendment of 431B, it was only required if the defendant requested the zero principles. And in the case of Glasper, the defendant requested, I believe, at least one of the questions to be asked. Therefore, that moved the pre-amended rule into a mandatory position, just as our current amended 2007 version would put it. So the same logic of Glasper applies because in both the pre-amendment and the amended version, there was a mandatory obligation to give those questions. So the people assert that this court's dissent in Blair, in following the Glasper approach, is a logical and reasonable approach with which to take as the mandatory obligation was present both in Glasper and the current situation. Okay, so the people... It does not mandate an automatic reversal. It does not mandate an automatic reversal. But you want us to follow the dissent in Blair in the other cases, the out-of-district cases? Well, it's looking at... I mean, the question is this. Do we have to decide, do we have to follow the dissent who's sitting to my left here, okay? I mean, which is fine. You can ask us to do that. I just don't know what you're asking. Are you asking us to say the majority of Blair was wrong and the dissent in Blair was right because it followed his out-of-district cases? Is that what you want us to do? The people would say that the dissent was correct in that the error did not deprive the defendant of a substantial right. Well, but I guess the specific question is do we have to come out and disagree with the majority panel in Blair? That's my question to you. You do not have to until the Supreme Court finds another way. I need to rule in the state's favor here. Do we have to say Blair was decided? We're not going to follow a majority in Blair. We're going to follow what the dissent said in Blair. Do we have to do that in order to reach the result? Which is perfectly feasible here. I believe we have to, Your Honor, because Blair says there's an error. You reverse. That's all I'm asking. Yes. That was my question. The people would say, yes, the dissent is we would like the dissent to be followed. Well, you might very well be one-third of the way there. It's not an unreasonable request. I just want to know if that's what you're asking. Well, the purpose is there is to pick an impartial jury. That is the main goal you're trying to achieve. The Supreme Court came up with four questions that would assist the trial court in reaching that impartial jury. In this case, the jury was admonished of all four principles. They were specifically asked about two of the principles. They were also given the opportunity to respond. And each of them was asked, is there any reason you cannot be fair and impartial? There were two jurors, I believe, one that outright said yes. And I believe one kind of hesitated on the issue. Both of those were immediately excused. The people submit that in asking that question, and I honestly can't remember what other questions were asked at this point in time, that the goal of reaching an impartial jury was achieved in this case. Is there any other questions? I can go on to one of the other. I have nothing. Okay. As far as the motion to suppress, briefly wanted to address that. The people submit that there was probable cause at the time of the arrest. The defendant was a known offender. But we have to go back. There was probable cause, and it goes back to my first question. When was the arrest? The people submit there was probable cause at the time the defendant was seized. Why would the people want to do that? They don't have to, right? They don't have to. I mean, they can. It's fine. If there was probable cause at the time he was seized, then the question of when he was arrested doesn't matter. In fact, he was probably arrested then. The defendant was a known offender. The police knew his prior conduct. His similar prior offenses. They took caution with him in conducting the pat-down because he had been known to cut screens and have burglary tools in the past. He didn't have any at this time. That doesn't mean he may not have. They took caution with multiple officers because he was known to flee. Their presence, the people submit, was not threatening. The defendant was the only person walking along the road within 12 to 17 minutes of the offense. There were two tracks that led from the victim's yard to one block from where the defendant was eventually detained. And the defendant made several statements before his arrest and before he was seized. He was dropped off by a bicycle sign on Pearl City Road. See, but Counselor, that's what we need to get really, really precise because you've got questions and inconsistencies which you rely on. Yes. And that's why, you know, if those questions are answered before he's arrested, that's a difference for you guys. And that's why your position of when he's arrested is crucial. And I didn't get a consistent answer to that in the brief, and I'm trying to get one now. Because you're pointing to inconsistent statements he made, inconsistencies that came from these other two women, and the timing of these things in this fluid situation is very critical. And now you've just talked about some of these statements, but I don't know when they came in compared to when the State's position is that he was arrested. I think the statements you just referred to are critical. But what's critical is when did they come in, before or after he was arrested. The people who submit these statements came in before his arrest. These statements came in even before he was prevented from walking away, before he was handcuffed, and before he was placed in the squad car. These were all before those events happened, so it was long before an arrest was made. So it was the statement about where he was dropped off, what car dropped him off, where that car went, after it dropped him off. Are all those conversations with this woman known as Doris occurred before he was put in the squad car? That is correct, Your Honor. And that he was waiting for Paula to pick up her daughter Amanda from Parkview. All those statements were made before he was put in the squad car. Because the police knew him, they noticed a different demeanor from previous encounters with him. They observed a wet spot on his pants indicating that it was fresh grass clippings, indicating that he had been in grass and not just along the gravel of the road on Pearl City Road. And the fact that the statement of the car dropped him off on Pearl City Road and drove eastbound and the officer did not notice any red cars as he approached heading westbound. So the people submit there was probable cause and those statements then could be used. The people note that the defendant forfeited the contention in raising a motion to suppress evidence. They now go on to addressing statements briefly on the reasonable doubt. Many of the same pieces of evidence people also carry over into the reasonable doubt argument. The fact that there was no physical evidence neither includes nor excludes the defendant as the offender. The jury was able to make a reasonable inference from the fact that he was dropped off at Church and Sullivan, which was near the victim's home. There was a back gate. Both gates were found open. One officer said he opened the front gate. The back gate was open. And there was a due track that started 10 to 15 feet from the victim's home. The people submit that the jury could reasonably infer that the defendant was within that enclosed space of the patio. Also, the discrepancies in the statements were significant enough to find the defendant's reasons for being there incredible. Even if he did say he was trying to avoid his wife or another woman finding out about an affair, that doesn't explain why he couldn't say, Dory dropped me off at Church and Sullivan. That there's no logical reason that he shouldn't say he was actually dropped off further away from where he would have been meeting a potential amor. So the people submit that the inferences were, the circumstantial evidence, there were enough reasonable inferences for the jury, the panel of 12 people, to find him guilty beyond a reasonable doubt. Briefly, we'll touch upon the final, defendant's final contention of prosecutorial misconduct. Before you get to that, I need to go to some notes I had here about what you said before. And I've got down here that, oh, no, no, it was below. That's what I'm trying to argue. I mean, I'm getting the state's argument below. You're making a different argument than the state made below. Because as I understood the state's argument below, that the defendant was not yet arrested when he was placed in the squad car. And that below, that when he was placed in the squad car and the collective knowledge of the police gathered during his detention in the squad car, namely Officer Schooner's discovery that Doris' account conflicted with the defendant's, that provided the probable cause to arrest him if there was probable cause lacking before. So the argument that the state made below was that he was, that those statements from Doris did not, were not obtained until he was placed in the squad car, but that didn't matter. Now your position is different here. The position is different if the video of the stop was clear that statements were made before he was placed in the squad car. He made additional statements throughout his time with Officer Wichman. But there were statements made. Well, yeah, I mean, he made some statements. Yes, he made some statements. Yeah, but I mean, the position, I mean, there's no doubt he made some statements before he was placed in the squad car. But the state's position is that the statements that Doris made were not made until after he was placed in the squad car. That was the state's position below. And that was okay because the state's position below also was that he was not arrested when he was placed in the squad car. But you're telling us today that the state's position is different and that, in fact, he was arrested when he was handcuffed and placed in the squad car? The state's position, he was seized at the point he was handcuffed and put in the squad car. But you had those statements at that point. You had the statements at that point of seizure. Which I think the system was what they say the state says. The state, there were multiple statements the defendant was making throughout his, I believe it was 30, 45 minutes from the time he was first approached to the time they drove him to the station. He was constantly making statements, most of which were the same throughout the time of what he was doing there and who he was waiting for and who had dropped him off. But there were at least three statements that he made before the point of seizure. We mentioned before that the distinction between the seizure and the arrest is critical. And I thought you told me that he was arrested when he was placed in the squad car. No, I said he was seized when he was placed in the squad car. He was seized long before that. There's no question about it. He was told before that he couldn't leave. He was seized long before he was placed in the squad car. I mean, you can't seriously tell me that he was not seized until he was placed in the squad car. I'm saying that he was not seized until they prevented him from walking away. Which happened long before he was put in the squad car. I mean, they told him he couldn't go anyplace. He was seized long before that. There's no question. It was a teary stop before they placed him in the squad car. There's no question about that. I'm sorry, go ahead. Where were you going to go then? Okay, quickly on the final argument. There was evidence that was adduced one way at the motion to suppress. It came out not inconsistently, but not as exact as the motion to suppress at trial. An inference was then made in closing argument based on the evidence adduced at trial. That argument was not exact with the evidence adduced at the motion to suppress. The people realized that this was an error that was made. However, even without the error, the jury was still free to make the inference on their own based on the evidence adduced at trial. Also, the record, because it appears that nobody, the prosecutor, defense attorney, trial judge, the defendant, nobody even appeared to recognize that there was this non-exact match. The people submit that this was an inadvertent mistake rather than a nefarious scheme by the prosecutor as suggested in the defendant's brief. All right, counsel, thank you. Defense, you have the ball. Your Honor, first I'd like to address the state's position on the point of the arrest. Because on page 10 of their brief, they say the people submit the defendant was not arrested until he was prevented from leaving and handcuffed. So I think the inverse of that is he was arrested when he was prevented from leaving and handcuffed. And then on page 11, when discussing the fact that the trial court considered the other statements by Doris Gerloff and Paula Alfani and her daughter, the state basically concedes in their brief, this information was discovered after the defendant was arrested. Therefore, it cannot be used to find probable cause. That's their position in their brief. As to the 431B issue, again, here we submit that both prongs apply. Under prong one, it's a close case, and the error prejudiced Mr. Giles. And under prong two, we say under Blair, his case should be reversed as well. And the state contends that the goal of reaching an impartial jury was reached in this case, but that wasn't really what was shown in the record. Juror Campbell showed a troubling bias against defendants who have been arrested and seemed to equate arrest with proof beyond a reasonable doubt. And he was never asked whether he understood and accepted that a defendant doesn't have to present any evidence. As to the reasonable doubt issue, the state calls Mr. Giles' statements incredible. But again, the law says that his conviction has to be sustained on the strength of their case, not the weakness in any of his explanation. And finally, I would say that to call the prosecutor's misstatement in this case an inadvertent mistake is really quite the understatement. The prosecutor elicited at trial from Officer Wickman that after Giles had been transported to the police station, Giles asked Wickman if the police were investigating something that had been taken. And in closing argument, and Officer Wickman responded that he had, and that Officer Wickman responded back to Giles, I told him I just wasn't really sure what was being investigated. And in closing argument, this prosecutor called this another piece of evidence. This is another piece of evidence showing Giles is conscious of guilt because guess what, he knows what went on inside Lois Harlan's home. This is the only piece of evidence that links him to the inside of Lois Harlan's home. But in fact, the prosecutor knew that long before Giles was taken to the police station, when Officer Wickman stopped him on the street, the first thing out of Officer Wickman's mouth was, I'm pretty positive you're a suspect right now, and some stuff might have gotten taken, so you can't go anywhere. And the prosecutor at the motion to suppress even asked, when you initially stop and talk to the defendant, Giles, you advise him that you are investigating something that has been taken in the neighborhood, something to that effect. Isn't that a fair statement? And Officer Wickman replied yes. So the prosecutor knew that Giles didn't just volunteer this information at the police station that the police were investigating something that was taken and he had never been told that. The prosecutor at trial set up this false inference that Giles had actual personal knowledge of the crime because that knowledge was their missing link. But unfortunately for the state, that missing link didn't really exist. And by inserting this false inference into the case, this was not inadvertent. The prosecutor violated his duty here to ensure a fair trial, but to search for the truth. And clearly, clearly this prejudiced Mr. Giles, because the evidence connecting him to the crime was weak. And this false inference could have been exactly the piece of evidence, as the state told them to consider it as, that the jury used to find him guilty. It was the only evidence that placed him directly at the scene of the crime. And so if this court does not reverse Mr. Giles' conviction based on the insufficiency of the state's evidence, we ask that his conviction be reversed and the case remanded for a new trial based on the prosecutor's improper remarks here that were highly prejudicial, based on the 431B issue in this very close case, and based on the fact that he was arrested with probable cause, and we ask for a new trial without the statements that were made after his arrest. Thank you, Your Honors. Thank you.